**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| MARY A. SWEET, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:06-cv-839-SEB-JMS |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**ENTRY DISCUSSING COMPLAINT FOR JUDICIAL REVIEW**

Mary A. Sweet ("Sweet") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. § 301, *et seq*.

For the reasons explained in this Entry, the Commissioner's decision must be **affirmed.**

**I. BACKGROUND**

Sweet filed applications for DIB and SSI on March 6, 2002, alleging an onset date of disability of March 31, 2001. Her applications were denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted, and such hearing was conducted on November 8, 2004. Sweet was present, accompanied by her attorney. Medical and other records were introduced into evidence, and Sweet and a vocational expert testified at the hearing. The ALJ issued a decision on June 16, 2005, denying benefits. On March 25, 2006, the Appeals Council denied Sweet's request for review, making the ALJ's decision final, *see Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994), and this action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the *Federal Rules of Civil Procedure*, Michael J. Astrue, in his official capacity only, is the proper defendant in this action.

The ALJ's decision included the following findings: (1) Sweet met the insured status requirements of the Act on March 31, 2001, her alleged onset date of disability, and continued to meet them through December 31, 2007; (2) Sweet had not engaged in substantial gainful activity at any time since March 31, 2001, her alleged onset date of disability; (3) Sweet had "severe" impairments consisting of benign brain tumor (meningioma), status post subtotal surgical resection which left residual tumor; headaches; residual right trapezius muscle dysfunction; mild degenerative changes of the left AC joint; early degenerative joint disease of the bilateral knees; degenerative disc disease of the lumbar spine, with a slight bulging annulus at L4-5, and hemangioma; fibromyalgia; and GERD (gastroesophageal reflux disease); (4) Sweet's impairments, either singly or in combination, did not meet and were not equivalent in severity to one of the listed impairments in Appendix 1, Subpart P of Regulations No. 4; (5) Sweet's allegations concerning her symptoms and limitations were not fully credible for the reasons set forth in the ALJ's decision; (6) Sweet retained the residual functional capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds frequently; sit six hours during an 8-hour work day; stand and/or walk six hours during an 8-hour work day, provided the work allowed her to alternate into a sitting or standing position at her option for periods of one to two minutes per hour; no overhead work with the right shoulder, no walking on uneven surfaces, no kneeling, crawling, or climbing of ropes, ladders, or scaffolds; no work at unprotected heights or around dangerous machinery; and no operating a motor vehicle or being around open flames or large bodies of water; and the work must be simple and repetitive in nature; (7) Sweet was unable to perform any of her past relevant work with her current RFC; (8) Sweet was 41 years old, which is defined as a younger individual, she had a tenth grade education, and her past relevant work was semi-skilled; (9) Sweet's work skills were not transferable to other work within the RFC she retained; and (10) based on vocational expert testimony, there were a significant number of jobs which she could perform in her local region, consistent with her age, education, past relevant work, and the exertional and non-exertional limitations described in her RFC, including unskilled jobs at the light exertional level consisting of cashier (21,605), restaurant hostess (4,100), and inspector (2,640), and unskilled sedentary exertional level jobs including cashier (1,480) and inspector (1,173); (11) based on Sweet's age, education, past relevant work experience, and the RFC to perform a full range of light work, a finding of not disabled would be directed by Medical-Vocational Rule 202.18 in Appendix 2, Subpart P of Regulations No. 4; and (12) Sweet's non-exertional limitations prevented her from performing the full range of light work, however, based on vocational expert testimony, there were still a significant number of jobs which she could perform consistent with her vocational factors and the exertional and non-exertional limitations described in her RFC, and therefore a finding of not disabled was appropriate, using Medical-Vocational Rule 202.18 as a framework for decision-making. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Sweet had not been under a "disability" as defined in the Act at any time through the date of the ALJ's decision.

## II.  DISCUSSION

### A.  Applicable Law

To be eligible for DIB and SSI, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. §§ 416.908; 404.1508.

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Butera v. Apfel,* 173 F.3d 1049, 1054 (7th Cir. 1999).

> In order to determine whether an individual is entitled to disability insurance benefits, the ALJ must engage in a sequential five-step process which establishes whether or not the claimant is disabled. The claimant must show that: (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir.1997); 20 C.F.R. § 416.920.

*Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B.  Analysis

The ALJ determined that Sweet had "severe" impairments consisting of benign brain tumor (meningioma), status post subtotal surgical resection which left residual tumor; headaches; residual right trapezius muscle dysfunction; mild degenerative changes of the left AC joint; early degenerative joint disease of the bilateral knees; degenerative disc disease of the lumbar spine, with a slight bulging annulus at L4-5, and hemangioma;

fibromyalgia; and gastroesophageal reflux disease, but she could perform a significant number of light and sedentary jobs and, therefore, was not disabled. Sweet argues that the ALJ's decision is not supported by substantial evidence. Specifically, she contends that the ALJ improperly rejected the opinions of treating physicians, that the ALJ's credibility and RFC assessments relied on speculation and mischaracterizations and were not supported by substantial evidence, and that new evidence submitted to the Appeals Council should warrant a sentence six remand.

### 1. Opinions of Treating Physicians

Sweet first argues that the ALJ erroneously evaluated the opinions of various treating physicians. The Seventh Circuit discussed the "treating physician rule" in *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In that case, like here, the plaintiff argued that it was erroneous for the ALJ to refuse to give controlling weight to treating physician opinions when they were inconsistent with evidence from physicians who had not treated or even examined the claimant. *Id.* at 376. The court rejected this argument, holding that if well-supported evidence is introduced which contradicts the opinion of a treating physician, even if it is that of non-treating, non-examining physicians, then the treating physician evidence is not controlling and it is just one more piece of evidence to consider. *Id.* at 377. Moreover, an ALJ is entitled to rely on the opinions of state agency physicians. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

Dr. Powell, Sweet's family doctor, opined on January 29, 2004, that Sweet was "totally disabled" and "unable to perform any work." (R. at 811). Dr. Powell also completed a functional limitations form on May 19, 2003, opining that Sweet had moderate limitations in sitting, standing, walking, lifting, pushing/pulling, squatting, climbing, and reaching above shoulders. (R. at 647). In a letter of February 3, 2004, Dr. Powell opined that Sweet had been unable to participate in any full-time work in recent years because of frequent medical concerns secondary to her episodic vomiting, fatigue, and pain. (R. at 810). In a March 26, 2004, letter, Dr. Powell stated that she was in agreement with the extensive limitations set forth in the physical capacity evaluation completed by Sweet, and opined that Sweet had had chronic fatigue, a lot of back pain, could not sit or walk for prolonged periods of time, and had depression, shortness of breath, and repetitive vomiting episodes. (R. at 808). She also opined that she agreed with Sweet's own assessment of her mental RFC, and that Sweet had some significant depression symptoms, some limitation in her ability to concentrate, and some visual and decision-making difficulties. *Id.*

The ALJ concluded that Dr. Powell's functional limitations were not supported by objective medical evidence or other evidence of record. (R. at 76). The ALJ stated that the diagnostic studies and clinical findings indicated that her back, bilateral shoulders, knee, and feet impairments were of a mild nature. *Id.* Although the ALJ acknowledged Sweet's fibromyalgia as a "severe" impairment, he noted that it had not been diagnosed by a rheumatologist and Sweet's allegations as to the frequency and severity of her

4

musculoskeletal pain were inconsistent with evidence of record. *Id.*[2] He noted that Dr. Powell was not a specialist and that none of the treating orthopedic surgeons, neurologists, or neurosurgeons had placed any restrictions on Sweet's work activities. *Id.* The ALJ did not adopt Dr. Powell's conclusion that Sweet was totally disabled because the ultimate determination of whether a claimant is disabled is reserved to the Commissioner. (R. at 75). *See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000) ("A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'"). The ALJ gave minimal weight to Dr. Powell's opinion concerning Sweet's mental functional limitations because she is not a psychologist or psychiatrist. *Id.*

Sweet argues that Dr. Powell's opinions should be given controlling weight and that the ALJ's reasoning is not supported by substantial evidence. The ALJ, however, discussed the record at length in relation to Dr. Powell's opinions and provided reasonable explanations for his conclusions in this regard. Under these circumstances, the ALJ's evaluation of the opinions of Dr. Powell is supported by substantial evidence.

The ALJ acknowledged the statement by Dr. Munshower dated April 20, 2001, that Sweet had become disabled on March 31, 2001, due to headaches, parasthesias, posterior fossa lesion, facial numbness and tingling. (R. at 75). The ALJ noted that Sweet subsequently went on short term disability and had meningioma surgery. *Id.* The ALJ stated that although Sweet had been examined by a number of neurologists and neurosurgeons since Dr. Munshower's statement, none of them had placed any work restrictions on Sweet. *Id.* Sweet argues that the ALJ erroneously discredited Dr. Munshower's opinion for the reason that no other specialist had made similar restrictions. She asserts that silence by other physicians does not produce contradicted evidence. Dr. Munshower, however, stated that he did not know how long Sweet would be considered disabled from work. (R. at 867). Because Dr. Munshower did not examine Sweet at a later date, the ALJ's determination to credit his opinion only to the extent Sweet was unable to work after her surgery and for a post-surgical recuperative period was based on substantial evidence.

On July 11, 2001, Dr. Fink evaluated Sweet's right shoulder pain. (R. at 46). On October 15, 2001, Dr. Fink opined that Sweet could return to work that same day, with a restriction of no lifting with the right arm. (R. at 47, 75, 386). An orthopedic specialist, Dr. Misamore, saw Sweet on November 27, 2001. (R. at 47). Sweet reported that her symptoms had begun to improve spontaneously in the last few weeks. *Id.* At that time, Sweet had significant atrophy throughout the upper trapezius, but there was some

---

[2] Nonetheless, the ALJ noted that the physician who did diagnose fibromyalgia in November 2003, indicated that Sweet had no restriction in range of motion of any joint and no decrease in strength in any muscles, and he placed no restrictions on her activities. (R. at 74). The ALJ stated that the restrictions included in his RFC assessment took into account the limitations which might reasonably be imposed by her fibromyalgia. *Id.*

5

restoration of muscle function suggested during active elevation of the scapula. *Id.* Dr. Misamore's opinion was that Sweet had some persistent paresthesias in the right trapezius resulting in some pain and shoulder dysfunction, but was having some early return of nerve and motor function, and her prognosis was excellent. *Id.* On September 24, 2002, a neurosurgeon, Dr. Fesenmeier, examined Sweet and noted that her right shoulder was a little bit weaker on shrug than her left and her motor strength was 5/5 in all extremities, except for the lower left extremity, and there was no muscle atrophy. (R. at 51, 198-202).

Dr. Fink opined that Sweet could return to work, but the ALJ did not fully credit Dr. Fink's restriction to no lifting with the right arm because by September 24, 2002, Sweet did not have muscle atrophy on examination and her right shoulder was only a little bit weaker than the left. (R. at 75). The ALJ noted that no other orthopedic surgeon, neurologist, or neurosurgeon placed any restrictions on Sweet's use of the right arm. *Id.* It is not error for the ALJ to note the subsequent opinions of other specialists and the improvement noted in those examinations. The court must decline any invitation to resolve conflicts in or reweigh the evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) ("We cannot substitute our own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled."). The ALJ's evaluation of the opinions of treating physicians is supported by substantial evidence.

### 2. Credibility and RFC Assessments

The ALJ's RFC assessment was that Sweet could lift and carry twenty pounds occasionally and ten pounds frequently; sit six hours during an 8-hour work day; stand and/or walk six hours during an 8-hour work day, provided the work allowed her to alternate into a sitting or standing position at her option for periods of one to two minutes per hour; no overhead work with the right shoulder, no walking on uneven surfaces, no kneeling, crawling, or climbing of ropes, ladders, or scaffolds; no work at unprotected heights or around dangerous machinery; and no operating a motor vehicle or being around open flames or large bodies of water; and the work must be simple and repetitive in nature. (R. at 72, 78). Sweet asserts that the ALJ's RFC and credibility determinations were based on speculation and mischaracterization.

The ALJ found that Sweet's allegations concerning the frequency and severity of her symptoms were not reasonably consistent with the objective medical evidence or other evidence of record, and therefore, were not fully credible. (R. at 68). In determining Sweet's credibility, the ALJ discussed the proper criteria, which include: daily activities; the nature, location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side-effects of medication; treatment, other than medication, for relief of pain; and any other factors concerning functional restrictions. *See* (R. at 63-68, citing Social Security Ruling 96-7p; 20 C.F.R. §§ 404.1529, 416.929). The court grants special deference to the credibility determination made by the ALJ and generally will not overturn an ALJ's credibility finding unless it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001).

6

Sweet first argues that the ALJ erred in his determination that Sweet's coughing, choking and vomiting could not be of the severity she alleged because she occasionally ate at restaurants. It is true that the ALJ did not ask Sweet how she handled any coughing or vomiting episodes when she ate out. Sweet also asserts that the ALJ misstated her testimony when he stated that her coughing, choking, and vomiting were made worse by eating. (R. at 66). She contends that she did not report that her symptoms were worse with eating. Sweet did testify, however, that eating caused her to cough more, and that when she coughed too hard she ended up vomiting. (R. at 1074). The ALJ's interpretation of her testimony in that regard was reasonable. Sweet testified that she vomited two or three times a week, that it had been happening for over two years and she had gotten used to it, and she pretty much would just "vomit and go on." (R. at 1074-1078). Even if her testimony concerning these symptoms were given full credit, it is not apparent how it would limit further than that assigned by the ALJ Sweet's ability to function in the work place.

Sweet also argues persuasively that the ALJ merely speculated when he determined that normal muscle bulk in her right shoulder was proof that she had been lifting with that arm. (R. at 74). There is no evidence of such a connection between muscle bulk and lifting. The ALJ, however, discussed the various medical opinions, examination findings, x-rays, and MRI's of record relating to Sweet's shoulder pain. (R. at 73-75). The ALJ acknowledged Sweet's bilateral shoulder pain by limiting her to light level work and restricting all overhead work with her right shoulder. The ALJ's assessment is supported by substantial evidence.

Sweet also contends that the ALJ misstated Sweet's reports about her daily activities. The ALJ noted that on January 25, 2003, Sweet stated she took a small nap after she got her children off to school and that she then lasted about 12 hours a day before she was ready for bed. (R. at 66, 130). Sweet argues that she actually reported that she only lasted 12 hours a day, not 12 hours more after her morning nap. She contends that the ALJ made her appear more functional than she actually was. She points out that at the hearing she testified that she slept anywhere from 9:00 a.m. to noon when she napped in the morning and she rested during the day in addition to napping in the morning. Sweet did report that she took a "small nap in the morning" and then she described what she does during a typical day. (R. at 130). She described her activities and then stated "I only last for about 12 hours a day." *Id.* At the hearing, she testified that she went back to bed at 7:30 a.m. and napped anywhere until 9:00 a.m. to noon, and that she rested at times during the day. (R. at 1062-1063). The ALJ acknowledged Sweet's allegations of fatigue and that she must lie down throughout the day. (R. at 66). He found those reports inconsistent, however, with her activities of daily living and her social activities. *Id.* He cited reports that she took her children to school, showered and dressed, did one to three loads of laundry with help from her daughter, did dishes, cooked dinner, and ran errands if needed. (R. at 145, 146, 194, 228, 243-44). She reported cooking four to five days per week, laundry, driving, some of the lawn work (son did most), and a little house cleaning each day. *Id.* When she was too tired to cook, they ate leftovers or pizza. *Id.* Her children helped her lift groceries. (R. at 68). Sweet helped her daughter with homework, occasionally got together with women she used to work with, occasionally went out for dinner, occasionally attended church, got

married in 2004 and went on a week long cruise. *Id.* Although Sweet disagrees with the ALJ's analysis and points to evidence showing that Sweet had difficulty performing even minimal activities, the court does not find that the ALJ's evaluation of her activities was patently wrong. The ALJ's assessment of Sweet's daily activities is supported by the record.

Sweet further argues that the ALJ's RFC and credibility assessments were not supported by substantial evidence. She asserts that the sheer frequency of her medical appointments would have precluded competitive work. She contends that the ALJ improperly circumvented this issue by finding that she was involved in litigation after her first motor vehicle accident in 1999 and that it appeared to have still been ongoing beyond May 2003. (R. at 67). The ALJ reasoned that her frequent doctors' visits may have been for the purpose of establishing personal injuries for her lawsuit. *Id.* Sweet suggests that there were few allegations of the types of injuries sustained in the accident in the records at issue for her disability claim. The ALJ noted that Sweet's allegations concerning the frequency and severity of musculoskeletal pain were not supported by the diagnostic imaging which showed only mild conditions, and that an orthopedic specialist noted in September 2002, that although it had been suggested to her, Sweet had not seen a rheumatologist for her complaints of diffuse myalgia. (R. at 67, 199). The ALJ also stated that he accommodated Sweet's knee and feet impairments by permitting her to alternate into a sitting or standing position at her option for one to two minutes per hour, no walking on uneven surfaces, and no kneeling or crawling. (R. at 72). It does not appear that the ALJ relied extensively on any implications of the litigation in determining Sweet's RFC. Rather, he focused his analysis more on the diagnostic studies and clinical findings. (R. at 72-76).

Sweet argues that the ALJ noted her reports of drowsiness caused by medication, but he never took the analysis any further. The ALJ did, however, expressly incorporate his consideration of Sweet's fatigue by limiting her to simple and repetitive light or sedentary work. (R. at 75).

Sweet also contends that the ALJ failed to properly evaluate her depression. She asserts that the ALJ failed to consider the exacerbating effect of her depression on other symptoms such as memory problems, ability to deal with stress, fatigue and headaches. The ALJ evaluated Sweet's mental impairments, concluding that she had no more than minimal mental functional limitations. (R. at 68-69). He noted that the record did not document any ongoing treatment by a mental health specialist. *Id.* He reviewed the reports of consulting psychologist Dr. Smith, neurologist Dr. Munshower, a therapist who evaluated Sweet, and Dr. Arbuck. (R. at 66). The ALJ discussed their various findings that Sweet had normal memory, good short term and remote recall, and good concentration. *Id.* Dr. Smith noted she was persistent and able to complete tasks in a timely manner. (R. at 69). The ALJ noted that although Dr. Arbuck thought Sweet's concentration was decreased because she had to re-ask questions, other examinations revealed normal concentration. *Id.* The ALJ also relied on the fact that the State Agency psychologists concluded that Sweet had no more than mild mental functional limitations. *Id.* In addition, the ALJ recognized that her headaches and side-effects from medications could result in additional deficits in her

concentration. He stated that he included in his RFC assessment a restriction to simple and repetitive work to accommodate Sweet's limitations in memory and concentration resulting from the combination of her impairments. (R. at 74). The ALJ discussed the applicable evidence of record and properly articulated how he weighed that evidence in evaluating Sweet's mental impairments. That evaluation is supported by substantial evidence.

In sum, the ALJ discussed in detail the various factors in weighing a claimant's credibility. He gave reasons for his conclusions and those reasons are supported by substantial evidence. The ALJ credited Sweet's reports of functional limitations to some extent in assessing her RFC, finding that she could do light level unskilled work with various restrictions. The ALJ's discussion relating to Sweet's credibility is adequate to allow the court to trace his reasoning. The court does not find that the ALJ's analysis is patently wrong, and therefore, must affirm the ALJ's credibility determination.

### 3. Additional Evidence - Sentence Six

On October 24, 2005, Sweet submitted additional materials to the Appeals Council but review was denied. (R. at 10, 1034-1045). Sweet now contends that these materials warrant a remand pursuant to sentence six of 42 U.S.C. 405(g). A court may order a "sentence six" remand when a claimant presents new, material evidence which, for good cause, she could not have presented in a prior proceeding. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997); *Richmond v. Chater*, 94 F.3d 263, 268 (7th Cir.1996). Evidence is "new" if it did not exist or was unavailable to the claimant at the time of the administrative proceeding. *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). To be material, the evidence must "'relate to the claimant's condition during the relevant time period encompassed by the disability application under review.'" *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999) (quoting *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989)). In addition, such evidence is "material" if there is a reasonable probability that it would have changed the outcome of the ALJ's decision. *Schmidt*, 395 F.3d at 742. The hearing was held on November 8, 2004, and the ALJ's decision was issued on June 16, 2005.

One surgical note of May 5, 2005, did not exist at the time of the hearing, but may have been transcribed and existed prior to the issuance of the ALJ's decision. That note described a partial medial meniscectomy, right knee arthroscopic surgery. (R. at 1045). The remaining documents consisted of clinic notes dated June 27, September 1, October 6, and October 10, 2005. For purposes of this analysis, each of these reports will be considered "new" because they did not exist at the time of the hearing. The issue remains whether the submitted evidence was material.

On June 27, 2005, Dr. Pascuzzi saw Sweet and noted in response to questions as to why Sweet had changed neurologists, "[t]he record will show that Dr. _____ left for Loyola in Chicago, and therefore it is logical that she would not continue to see him." (R. at 1043). On September 1, 2005, Dr. Maskoun reviewed Sweet's complaints of multiple regional pains. (R. at 1039). He stated that her pain was worse in her knees, shoulders,

dorsum of her feet, low back and cervical neck region, in that order of priority. *Id.* He stated that the right knee arthroscopic surgery for torn meniscus did not help. *Id.* He diagnosed chronic arthralgias benign hypermobility syndrome and secondary fibromyalgia. (R. at 1040).

On October 6, 2005, Dr. Ang saw Sweet for a reevaluation of chronic pain. (R. at 1036). His impression was that Sweet had hypermobility syndrome and fibromyalgia. *Id.* He recommended an increase in her dose of Cymbatta for pain and that she start a cardiovascular exercise program and participate in a fibromyalgia exercise research study. *Id.*

The October 10, 2005, note by Dr. Pascuzzi reported increasing neck pain and vomiting, some dizzy spells and tinnitus on the right. (R. at 1035). Dr. Pascuzzi stated that he would refer Sweet to Dr. Wellington in the pain clinic "to see if there is some local therapy that can help with regard to the right head and neck pain which is now becoming more severely disabling." *Id.* Dr. Pascuzzi opined that Sweet was "permanently and totally disabled for any type of reasonable work on the basis of her chronic pain syndrome." *Id.*

Evidence that conditions worsened after the denial of benefits is not relevant to the question of whether Sweet was eligible for disability during the period of time considered by the ALJ. *See Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th. Cir. 1989) (denied sentence six remand where reports postdating the hearing addressed only the claimant's current condition, not his condition at the time application was under consideration by the Social Security Administration). The "new" physician notes discuss Sweet's current conditions. Dr. Pascuzzi referenced her head and neck pain that was "now becoming more severely disabling." Moreover, the ALJ would not have accepted any physician's finding that Sweet was "permanently and totally disabled," because he noted in his decision that the ultimate determination of whether a claimant is disabled is reserved to the Commissioner. Therefore, the evidence is not "material." For these reasons, the evidence submitted to the Appeals Council does not meet the requirements for a remand under sentence six of 42 U.S.C. 405(g)**.**

## III. CONCLUSION

In determining Sweet's eligibility for benefits, the ALJ applied the proper analytical methodology and fairly considered and weighed the evidence. The ALJ's decision was based on consideration of: (1) Sweet's age, education, and work history; (2) Sweet's history of diagnoses, surgeries, treatment, medications, and evaluations; (3) Sweet's own account of her conditions, capabilities, limitations, symptoms and daily routine; and (4) the testimony of Sweet and a vocational expert, and affidavits of her mother and boyfriend. The ALJ sufficiently articulated his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to "trace the path of [his] reasoning." *Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999) (quoting *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)). The ALJ built an "accurate and logical bridge from the evidence to his conclusion." *Lopez ex rel. Lopez v. Barnhart*, 336 F3d 535, 539 (7th Cir. 2003) (internal quotation omitted). The ALJ's RFC determination is restrictive and reasonably accommodates Sweet's multiple impairments. Although another fact-finder could certainly weigh the evidence and arrive at different conclusions, the court is not in a position to do so. There was substantial evidence to support the ALJ's determination that Sweet was not disabled as defined in the Act at any time through the date of the ALJ's decision.

There was no reversible error in the assessment of Sweet's applications for DIB and SSI. The final decision of the Commissioner is supported by substantial evidence and is not tainted by legal error. In these circumstances, Sweet is not entitled to relief in this action. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 09/27/2007

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana